## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AIMEE BRYAN, Derivatively on Behalf of Nominal Defendant COUPANG, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| BOM SUK KIM, NEIL MEHTA, BENJAMIN SUN, KEVIN WARSH, GAURAV ANAND, HARRY YOU, MATTHEW CHRISTENSEN, LYDIA JETT, and MICHAEL PARKER, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| COUPANG, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Aimee Bryan ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Coupang, Inc. ("Coupang" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers for Defendants' (defined below) breaches of fiduciary duties, unjust enrichment, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants,

United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Coupang, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Coupang against certain officers and members of the Company's Board (collectively, the "Individual Defendants") (defined further, *infra*) for breaches of their fiduciary duties arising from materially false and misleading statements and omissions to investors concerning Coupang's anti-competitive practices and other illicit activities that helped pad the Company's revenues and profits to the detriment of Coupang's customers, merchants, suppliers, and employees in connection with the Company's March 2021 initial public offering ("IPO") and subsequent statements from March 11, 2021 through March 15, 2022 (the "Relevant Period").

2.     Coupang is an e-commerce company headquartered in Seoul, South Korea with operations and support services throughout China, Singapore, Japan, Taiwan, and the United States. The Company uses mobile applications and Internet websites to offer a wide range of products and services throughout the South Korean retail market, including home goods, apparel and beauty products, electronics, grocery and restaurant orders and deliveries, and content streaming. In addition to selling first-party goods that it sources itself, Coupang also provides a marketplace for third-party merchandise. Coupang's relationship with third-party merchants allows it to provide a much wider selection of goods to customers than would otherwise be possible, adding to its appeal and convenience.

3.     Coupang also provides a "Rocket WOW" customer loyalty program which purports to offer additional benefits to its most engaged customers, including enhanced delivery options

and discounts. Due to its large footprint and quick delivery, Coupang is commonly referred to as the "Amazon of South Korea." Much of Coupang's ability to attract and retain customers is based on the purported convenience and speed of ordering from Coupang made possible by the Company's large supply chain infrastructure.

4.       On February 12, 2021, Coupang filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021 ("Registration Statement"). On March 11, 2021, Coupang filed with the SEC a prospectus for the IPO on Form 424B4, which formed part of the Registration Statement (the "Prospectus" and together with Registration Statement and attendant materials filed or published with these forms, the "IPO Materials"). Pursuant to the Registration Statement, Coupang sold to the investing public 100 million shares of Coupang Class A common stock at $35 per share, for total gross proceeds of $3.5 billion.

5.       In its IPO Materials and subsequent statements throughout the Relevant Period, the Company issued several false and misleading statements to the market concerning its working conditions and the safety of its workers; its business dealings with its suppliers and merchants; and its policies and procedures to protect customers. Specifically, the Company failed to disclose that: (i) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (ii) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations; (iii) the Company misappropriated protected trade content from its merchants to maximize the commissions it earned on third-party sales; (iv) the Company had improperly manipulated search algorithms and product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants; (v) the above mentioned misconduct exposed the Company to a heightened, but

undisclosed, risk of reputational and regulatory scrutiny; and (vi) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of improper, unethical, and/or illegal practices, and, thus, unsustainable.

6.     The truth regarding the Company's practices gradually emerged following the Relevant Period. For instance, on March 25, 2021, Korean news outlet, the *Korea Herald*, reported that a Company employee in his early 40s died his second day on the job, triggering "speculation that he may have become the latest delivery worker to die from apparent overwork." On this news, Coupang's stock dropped by nearly 5%, or $2.30, to close at $43.70 on March 25, 2021.

7.     On May 3, 2021, a number of civic groups representing the interests of small business owners in South Korea held a press conference at the headquarters of the People's Solidarity for Participatory Democracy ("PSPD") to announce that they reported Coupang to the Korea Fair Trade Commission ("KFTC") for requiring small business owners to hand over their protected trade materials in its Seller Terms and Conditions. On this news, Coupang's stock dropped 1.3% to close at $41.49 on May 4, 2021.

8.     On June 17, 2021, a fire broke out at Coupang's Deokpyeong Facility, one of its largest and most important fulfillment centers. Because of the large amount of flammable materials scattered throughout the facility, like vinyl and paper boxes, the fire was not completely extinguished until June 22, 2021. The fire came just months after a February 2021 investigation by an independent third-party company that revealed 277 defects with the facility's fire safety system.

9.     News of the fire and the Company's hazardous safety conditions sparked outrage among the public in South Korea, including protests and boycotts. On June 22, 2021, the K*orea Times* reported that the boycott was "growing" following the spread of the "grim facts" from online

petitions, and that "Coupang has been bent on maximizing its profit under the motto of 'Rocket Delivery' by exploiting workers." Following this news, Coupang's stock price declined $2.62, or 6.55%, between June 22 and June 25, 2021.

10.     On July 4, 2021, the *Korea Herald* revealed that the KFTC was investigating Coupang for manipulating the algorithm for its search function to favor its higher-margin private brand ("PB") products above others in its online store. The KFTC opened another investigation into Coupang's manipulation of product reviews in 2022.

11.     On August 18, 2021, the KFTC issued a corrective order and fined Coupang approximately $2.8 million for forcing hundreds of suppliers—including large manufacturers such as LGHH, Yuhan Kimberly, Procter & Gamble, and Lego—to comply with unlawful sales and marketing demands that violated South Korea's Monopoly Regulation and Fair Trade Act, and the Act on Fair Transactions in Large Retail Businesses. On this news, Coupang's stock price dropped $1.24 per share, or 2.0%, to close at $31.73 per share on August 19, 2021.

12.     As set forth herein, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     As a result of the foregoing, a securities fraud class action has commenced against the Company and certain members of the Board captioned *Choi v. Coupang, Inc. et al*, Docket No. 1:22-cv-07309 (S.D.N.Y.) (the "Securities Action"). The Securities Action has exposed the

Company to massive class-wide liability.

15.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

16.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Coupang's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Coupang's stock trades on New York Stock Exchange ("NYSE") located in this District, the Company conducts business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

*Plaintiff*

22.     Plaintiff is and has been a current and continuous holder of Coupang common stock since at least March 11, 2021.

*Nominal Defendant*

23.     Nominal Defendant Coupang is incorporated under the laws of Delaware with its principal executive offices located in Seattle, Washington. Coupang's common stock trades on the NYSE under the ticker symbol "CPNG."

*Individual Defendants*

24.     Defendant Bom Suk Kim ("Kim") is the Company's founder and has served as Chief Executive Officer ("CEO") and Chairman of the Board since May 2010. As set forth in the proxy statement filed by Coupang with the SEC on April 28, 2023 (the "2023 Proxy"), as of March 31, 2023, Kim beneficially owned 179,575,356 shares of Coupang's Class B common stock, representing 100% of the Company's total outstanding Class B common stock equal to 76.5% of the total voting power of all shares. According to the 2023 Proxy, Kim received $1,931,296 in

compensation from the Company in 2022. Defendant Kim is named as a defendant in the Securities Action.

25.     Defendant Neil Mehta ("Mehta") has served as a member of the Board since December 2010 and is currently the Lead Independent Director. Mehta also serves as the Chair of the Board's Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy, as of March 31, 2023, Mehta beneficially owned 70,651,928 shares of Coupang's Class A common stock. According to the 2023 Proxy, Mehta received $352,494 in compensation from the Company in 2022. Defendant Mehta is named as a defendant in the Securities Action.

26.     Defendant Benjamin Sun ("Sun") has served as a member of the Board since July 2010. Sun also serves as a member of the Audit Committee. As set forth in the 2023 Proxy, as of March 31, 2023, Sun beneficially owned 9,476,618 shares of Coupang's Class A common stock. According to the 2023 Proxy, Sun received $312,497 in compensation from the Company in 2022. Defendant Sun is named as a defendant in the Securities Action.

27.     Defendant Kevin Warsh ("Warsh") has served as a member of the Board since October 2019. Warsh also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2023 Proxy, Warsh received $324,996 in compensation from the Company in 2022. Defendant Warsh is named as a defendant in the Securities Action.

28.     Defendant Gaurav Anand ("Anand") has served as the Company's Chief Financial Officer ("CFO") since December 2020 and previously served as the Chief Operating Officer ("COO") from January 2019 to December 2020. As set forth in the 2023 Proxy, as of March 31, 2023, Anand beneficially owned 2,607,500 shares of Coupang's Class A common stock.

According to the 2023 Proxy, Anand received $9,668,744 in compensation from the Company in 2022. Defendant Anand is named as a defendant in the Securities Action.

29.     Defendant Harry You ("You") served on the Board from January 2021 until June 2023. Defendant You is named as a defendant in the Securities Action.

30.     Defendant Matthew Christensen ("Christensen") served on the Board at the time of the IPO until he resigned, effective immediately, on June 7, 2021. Defendant Christensen is named as a defendant in the Securities Action.

31.     Defendant Lydia Jett ("Jett") served on the Board at the time of the IPO until she resigned, effective immediately, on October 26, 2021. Defendant Jett is named as a defendant in the Securities Action.

32.     Defendant Michael Parker ("Parker") served as Coupang's Chief Accounting Officer from October 2019 to September 2022. Since September 2022, Parker has served as Coupang's Vice President, Investor Relations. Defendant Parker is named as a defendant in the Securities Action.

33.     Defendants referenced in paragraphs 24 through 32 are herein referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers and/or directors of Coupang, and because of their ability to control the business and corporate affairs of Coupang, the Individual Defendants owed Coupang and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Coupang in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Coupang and its shareholders so as to benefit all shareholders

equally.

35.     Each director and officer of the Company owes to Coupang and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Coupang, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the officers and directors of Coupang were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Coupang, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

10

growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.     To discharge their duties, the officers and directors of Coupang were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Coupang were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Coupang's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Coupang conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Coupang and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to

be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Coupang's operations would comply with all applicable laws and Coupang's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

41.     Each of the Individual Defendants further owed to Coupang and the shareholders the duty of loyalty requiring that each favor Coupang's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Coupang and were at all times acting within the course and scope of such agency.

43.     Because of their advisory, executive, managerial, and directorial positions with Coupang, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.     The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Coupang.

## COUPANG'S CODE OF BUSINESS CONDUCT AND ETHICS

45.     Coupang maintains a Code of Conduct that expressly applies to the Individual Defendants as directors and officers of the Company.

46.     As set forth in the Code of Conduct in a message from Kim, "Coupang is committed to conducting business in an ethical, transparent, and professional manner, and in compliance with laws, regulations, and our policies."

47.     In detailing the responsibilities of employees, the Code of conduct provides, "Compliance: Follow the law at all times. If you see anyone violating the law or if you are asked to do something you believe may violate the law, speak up and report it immediately."

48.     In a section titled "Compliance with Laws & Regulations," the Code of Conduct states that Coupang is committed to:

- Conducting business in an ethical, transparent, and professional manner, and in compliance with laws, regulations, and our policies.
- Incorporating legal and regulatory requirements into our business strategy and processes.
- Developing strong processes to anticipate risks, including new and changing legal and regulatory requirements.
- Providing employees and managers with access to the subject matter expertise needed to manage legal and regulatory risks.
- Monitoring regulatory compliance on an ongoing basis and periodically reviewing key processes.
- Remaining compliant with applicable licensing, permitting and other applicable rules and regulations in the locations where we operate.

49.     In a section titled "Financial Integrity & Accounting," the Code of Conduct provides:

COUPANG IS COMMITTED TO:

- Our accounting and reporting completely and accurately reflects the economic

13

substance of Coupang's business activities, consistent with generally accepted accounting principles, standards, and regulations for accounting and financial reporting.

- Preparing complete, accurate, and timely financial information for use in reports to management, investors, regulators, and other stakeholders.
- Ensuring that management decisions are based on sound economic analysis based on comprehensive facts and with appropriate consideration of the short- and long-term benefits and risks.
- Complying with all applicable laws and regulations as well as our policies and internal controls requirements, including regarding the retention of documents and records.

EMPLOYEES MUST:

- Maintain complete, accurate, and timely records and accounts to appropriately reflect all business transactions.
- Create documents that are complete, accurate, and transparent, and follow our policies in determining when to retain and dispose of documents and records.
- Never engage in or support inappropriate transactions, including those that misrepresent the substance of a transaction.
- Maintain effective processes and internal controls that completely and accurately reflect transactions, as well as prevent or detect inappropriate transactions.
- Speak up if you become aware of a questionable transaction or accounting by notifying the Accounting leadership team or using any of the Speak Up channels.

## **COUPANG'S AUDIT COMMITTEE CHARTER**

50.     Coupang maintains an Audit Committee Charter, Amended December 8, 2022,

which states the purpose of the committee is to, among other things:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
- maintain and foster an open avenue of communication with the Company's management, and Auditors;
- review any reports or disclosures required by applicable law and stock exchange listing requirements;
- help the Board oversee the Company's legal and regulatory compliance, including the internal audit function, legal function, compliance program, and

risk assessment; and

- provide regular reports and information to the Board.

51.     With respect to "Financial Review and Disclosure," the Audit Committee's

responsibilities include, among other things:

**6.     Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors prior to filing. The Committee will be responsible for recommending to the Board whether the proposed financial statements should be included in the Company's Form 10-K.

**7.     Proxy Report**. The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**8.     Earnings Press Releases**. The Committee will review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

52.     With respect to "Internal Control and Procedures," the Audit Committee's

responsibilities include, among other things:

**11.     Risk Assessment and Management**. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. In exercising oversight of the Company's risk identification and management processes, the Committee may consider issues such as the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

**12.     Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal

controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

## SUBSTANTIVE ALLEGATIONS

### *Background*

53.     In 2014, Coupang expanded with a comprehensive e-commerce platform, directly purchasing products from third parties and selling them to customers. At that time, the Company launched "Rocket Delivery service," which delivered same day or the next day packages. Currently, the Company also offers "Same-Day Delivery," "Dawn Delivery," and overseas shipping options; free 30-day returns; content streaming through "Coupang Play"; grocery delivery through "Rocket Fresh"; and online food delivery service in South Korea through "Coupang Eats."

54.     Coupang predominantly operates in South Korea, one of the most competitive and fastest-moving retail markets in the world. The Company boasts a highly connected, tech-savvy customer base that relies heavily on mobile device usage. Coupang competes with a wide variety of online and offline companies providing goods and services to customers and merchants, including traditional retailers and merchandisers, such as department stores, discount warehouses, direct retailers, and home-shopping channels. The Company also competes in "two-sided markets" where it must attract both customers and merchants to use its technology applications and websites.

55.     With the onset of the COVID-19 pandemic in South Korea in early 2020, consumers flocked to online shopping and Coupang's growth soared. The Company's 2020 revenues reached almost $12 billion, up 90% from pre-pandemic levels in 2019. By mid-2020, Coupang was named as the second highest-ranked company on the 2020 CNBC "Disruptor List," a list of 50 private companies with breakthroughs influencing business and market competition. To keep up with the rising demand for its delivery services, Coupang added nearly 25,000 new

jobs in 2020. By the end of 2020, the Company employed nearly 50,000 workers in South Korea.

56.     The Company's revenue principally consists of retail sales earned from online product sales to customers, commissions earned on transactions through its online business, consideration from online restaurant ordering and delivery services, third-party advertising, and subscription fees from its Rocket WOW members. With its significant revenue growth, Coupang became the largest e-commerce company in South Korea.

57.     Coupang sought to go public in the United States to capitalize on the Company's massive growth. The IPO Materials stated that the Company's annual revenue tripled from 2018 through 2020 ($4 billion to almost $12 billion, respectively). At the time of the IPO, Coupang had a larger business-to-consumer logistics footprint than any other e-commerce company in South Korea with over 100 fulfillment and logistics centers in over 30 cities, encompassing over 25 million square feet. The Company's 50,000-person workforce consisted of the largest directly employed delivery fleet in South Korea, including over 15,000 full-time drivers. In addition, the Company's e-commerce market share in South Korea is estimated to have grown from approximately 7% of the market in 2018 to approximately 14% in 2020.

58.     The Company held its IPO in March of 2021. On February 12, 2021, Coupang filed with the SEC the Registration Statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021. On March 11, 2021, Coupang filed the Prospectus for the IPO with the SEC, which formed part of the Registration Statement. Through the Registration Statement, Coupang sold 100 million shares of Coupang Class A common stock to the investing public at $35 per share, valuing the Company at over $60 billion. Certain private owners of Coupang, including Defendant Kim, sold an additional shares 30 million shares in the IPO, the proceeds from which did not go to the Company.

59.     Unbeknownst to investors, leading up to and at the time of the IPO, Coupang's historical revenue and profit growth was artificially inflated by the Company's systemic, improper, unethical, and unsustainable practices in violation of applicable laws and regulations. At the time of the IPO, these undisclosed practices exposed the Company to a severe, but unrevealed, risk of reputational and regulatory scrutiny, diminished business and financial prospects, and harm to its critical relationships with customers, merchants, suppliers, and employees.

60.     As detailed below, the Individual Defendants knew or were reckless as to whether the public statements issued or disseminated in the name of the Company during the Relevant Period were materially false and misleading and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

***Materially False and Misleading Statements in the IPO Materials***

61.     The IPO Materials stated in relevant part that Coupang's success and growth was rooted in and relied on, among other factors, its brand and reputation among customers, merchants, and suppliers, as well as its workforce:

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. ***We consider our employee relations to be positive***. [1]

62.     In his letter to investors included in the Registration Statement, Defendant Kim stated:

> We believe it is both our opportunity and responsibility to challenge expectations about important social issues in our community. In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek

_____

[1] All emphases added unless otherwise indicated.

for our drivers, even as we became the first major service to provide deliveries to customers seven days a week. We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits . . . . We hope such examples demonstrate that innovation can unlock both *a better world for our customers and a better workplace for our employees*.

63.     In the same letter, Kim added:

*We also support hundreds of thousands of suppliers and merchants who earn their living on Coupang* . . .. Even during an unprecedented pandemic, as small businesses in the country suffered net losses, small businesses on Coupang saw their sales increase by over 50% through direct access to our services and customers nationwide.

64.     The Registration Statement represented that Coupang "offered" its business partners advertising opportunities: "In addition to our e-commerce services, we also have a new offering in the online advertising space. *We offer opportunities to advertise on our websites and mobile applications*, including through banner advertisements, joint promotions, and other programs."

65.     The Registration Statement also stated that "*[t]he Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services* provided on its website and mobile applications."

66.     With respect to consumers, the Registration Statement represented that the Company offered customers the "lowest prices" available in South Korea:

In addition to superior experience, we believe *we also offer customers the lowest prices for our owned inventory selection*.

*             *             *

*Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items*.

67.     When discussing how it sources merchandise, Coupang stated:

*We have established an extensive network of suppliers* and merchants, which enables us to obtain a wide selection of merchandise while maintaining low prices

for customers. We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers. *We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers*.

68.    Similarly, the Registration Statement explained:

Our structural advantages from complete end-to-end integration, investments in technology, and scale economies *generate higher efficiencies that allow us to pass savings to customers in the form of lower prices*. We also source a large portion of merchandise directly from manufacturers, which can *contribute to better pricing for our customers*.

*       *       *

*In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices*.

69.    The Registration Statement explained the reasons for Coupang's past results as

follows:

Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019. *The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers*.

*       *       *

Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018. *The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers*.

70.    The Registration Statement also represented:

While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace. . . . *Our success in increasing selection,*

20

> *including expansion into new categories, has contributed to the increase in total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019.*

71.     The Registration Statement also represented that the Company provides its customers with personalized product promotions and recommendations:

> *We have developed technology that enables us* to increase our operating efficiency through enhanced product merchandising and supply chain management, and *to provide our customers with personalized product promotions and recommendations*.

72.     The Registration Statement also represented:

> *Our search technology produces a simplified experience* that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results, *helping customers find, compare, and make purchasing decisions easily*.
>
> *          *          *
>
> The foundation of our search and recommendations is a product knowledge graph that organizes by product, not by seller, which enhances the customer experience. *Search and recommendation results* are aided by deep learning, data analytics, and image recognition among other inputs to *produce greater relevance and personalization. As a result, we believe customers can identify what they want and the best value for that product easier through our tools than those on competitive services* that require customers to sort through multiple sellers to compare offers for a given product.

73.     Coupang also represented that it helps third-party merchants to improve and grow their business:

> [W]e focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. *These investments help* us deliver superior selection, convenience, and low prices to customers while helping *merchants to improve and grow their businesses*.

74.     Similarly, Coupang stated that its matching technology helps third-party merchants enhance demand generation and compete holistically:

> *We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation. Our customer-to-product matching*

*technology* ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience. This technology helps merchants compete holistically on overall customer experience**.

\*                     \*                     \*

**Our matching technology** ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, **provides product exposure to customers based on relevance and predicted customer experience**, among other variables. **This helps high-quality merchants compete holistically on overall customer experience. This results in** lowering barriers to entry for merchants, and **improving experience for customers**, which encourages repeat purchasing that **generates higher sales for merchants**.

75.     Similarly, Coupang stated that by condensing millions of new merchant listings daily into its product knowledge graph and leveraging machine learning, the Company's matching technology helped third-party merchants enhance demand generation and compete holistically on overall customer experience.

76.     The Registration Statement also informed investors that Coupang uses a system that rewards merchants for providing competitive prices:

Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items. **We achieve this through** our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and **our creation of a system that rewards merchants for providing competitive prices**.

77.     Coupang further stated "**we have policies and procedures to protect both merchants and customers on our marketplace**."

78.     Coupang also represented in the Registration Statement that the Company had a culture of customer centricity, stating:

Since 2013, we have invested billions of dollars to build our owned-inventory selection, proprietary technology, and the largest B2C logistics footprint as compared to other product e-commerce players in Korea. . . . **Those investments have been guided by our operating principles of putting customers at the center**

22

*of everything we do* . . . . In our view, ***our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation***.

79.     The IPO Materials further mischaracterized the various forms of "consideration" Coupang received from suppliers in exchange for its services, including "rebates" and "advertising services," stating, in relevant part:

> ***The Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services provided on its website and mobile applications***. The Company generally records these amounts received from suppliers to be a reduction of the prices the Company pays for their goods, and a subsequent reduction in cost of sales as the inventory is sold.

80.     The IPO Materials highlighted Coupang's marketing efforts and stated that the Company's new advertising offerings and "promotions" would continue to positively expand Coupang's addressable market, stating, in relevant part:

> In addition to our e-commerce services, we also have a new offering in the online advertising space. ***We offer opportunities to advertise on our websites and mobile applications, including through banner advertisements, joint promotions, and other programs. This offering is in the early stages, and we will continue to innovate***. In the near-to-medium term, we expect this offering to expand our total addressable market to include the advertising market, which was $12 billion in 2019 and is expected to grow to $14 billion by 2024.

81.     Coupang represented that it offered customers the "lowest prices" available "in the Korean market across a wide and diverse assortment of items."

82.     The Registration Statement also explained that Coupang was able to secure favorable pricing for customers due to its supplier relationships:

> ***We have established an extensive network of suppliers*** and merchants, ***which enables us*** to obtain a wide selection of merchandise while ***maintaining low prices for customers.*** We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers. ***We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers.***

83.     The Registration Statement further explained:

Our structural advantages from complete end-to-end integration, investments in technology, and scale economies *generate higher efficiencies that allow us to pass savings to customers in the form of lower prices*. We also source a large portion of merchandise directly from manufacturers, which can contribute *to better pricing for our customers*.

\*          \*          \*

*In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices*.

84.     The Registration Statement xplained the reasons for Coupang's past results as follows:

Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019. *The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers.*

\*          \*          \*

Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018. *The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers.*

85.     Similarly, the Registration Statement also represented that the Company's "success in increasing selection, including expansion into new categories, has contributed to the increase in total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019."

86.     Additionally, the IPO Materials represented that Coupang was providing its employees with a "better" workplace – which the IPO Materials characterized as "one of the

reasons for [Coupang's] success" – stating, in relevant part:

> In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week. We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits. The vast majority of drivers in the industry receive neither. Additionally, we are planning to grant up to Wl00 billion, or approximately $90 million, of restricted stock awards to our frontline workers and non-manager employees. We believe we are the first company in Korea to make our frontline employees stockholders.
>
> **We hope such examples demonstrate that innovation can unlock both a better world for our customers and a better workplace for our employees . . . We want to inspire others to follow our lead**.

*       *       *

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. **We consider our employee relations to be positive**. For example, we hire our Coupang Friends parcel delivery drivers as full-time employees **with stable work, manageable hours, and competitive benefits, which differs from the market practice of employing parcel delivery drivers as contractors. We are committed to offering our employees industry-leading wages, comprehensive benefits, and training programs**.
>
> **We subscribe to the philosophy that we, our suppliers, merchants, and employees should prosper together**.

*       *       *

> **Our employees and frontline workers are the backbone of Coupang and one of the reasons for our success**.

87.     The IPO Materials credited the Company's "Technology," "Customer-to- Product Matching," "Social Impact and Human Capital Resources," "Initiatives For Our Workforce," and "Partnership With Small Merchants," among other factors, as keys to Coupang's competitiveness, providing:

> **We believe that we are well positioned to effectively compete on the basis of the factors listed above**. We also face competition from major global Internet

25

companies, such as eBay. However, at this time, foreign e-commerce companies have a limited presence in Korea.

88.     On March 18, 2021, Coupang filed a registration statement on Form S-8 (the "S-8 Registration Statement") containing a reoffer prospectus relating to 29,700,836 shares of Class A common stock that were subject to the first early release from the lock-up period on behalf of 2,103 individuals, which became effective immediately upon filing. The registration of these shares permitted their resale on the secondary market without violating Rule 144 of the Securities Act.

89.     The S-8 Registration Statement expressly incorporated the IPO Registration Statement and the Prospectus, as well as "[a]ll documents filed by [Coupang] pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act on or after the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement that indicates that all securities offered have been sold or that deregisters all securities then remaining unsold."

90.     These statements in the IPO Materials and S-8 Registration Statement, detailed above, were materially false and/or misleading and failed to disclose that: (i) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (ii) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations; (iii) the Company misappropriated protected trade content from its merchants to maximize the commissions it earned on third-party sales; (iv) the Company had improperly manipulated search algorithms and product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants; (v) the above mentioned misconduct exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny; and (vi) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of improper, unethical, and/or

illegal practices, and, thus, unsustainable.

91.     The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the IPO Materials. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the IPO Materials of "the material factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how [the] risk affect[ed] [Coupang] or the securities being offered." The IPO Materials failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105. Indeed, the purported risk disclosures provided in the IPO Materials, to the extent they were relevant at all, were themselves materially misleading because they failed to disclose the true facts impacting Coupang's business, operations, and financial results and/or characterized materially adverse facts that had *already* materialized as contingent possibilities that *may* or *could* impact Coupang in the future but that had not yet materialized.

***The Individual Defendants' Cause the Company to Issue Additional False and Misleading Statements***

92.     On March 11, 2021, Defendant Kim appeared for an interview on Bloomberg Markets in connection with its IPO. The host noted that "you've had had several deaths among delivery and logistics employees who are allegedly overworked, overnight working," and asked "how does the company answer to this issue?" Defendant Kim responded as follows:

> You know it's heartbreaking, it's a tragedy whenever there's a passing of one of
> our family members, but here's the important context: we have hundreds of
> thousands of people who work in our operation and the fulfillment and delivery,

and we've had one work-related death in the past year. But one is too many, and we have to continue to do better. We are actually leading the industry on this front . . . .

93.     During the same interview, the host asked, "I wonder after reports of more than one—several—deaths of your employees what can you do to improve the situation?" Defendant Kim responded:

> As I mentioned, we have to continue to change and make the standards better. ***We are raising the bar*** and will continue to invest. We have invested hundreds of millions of dollars in automation that makes the deliveries not only a better experience for our customers but the work easier for our employees and ***we are, we will continue, to create good jobs, the best working condition jobs in the country***.

94.     Then, on March 24, 2021, news broke that a Coupang employee in his early 40s died his second day on the job earlier that day next to his company car in Incheon, South Korea. The *Korea Herald* reported the next morning, "[t]he courier's death immediately triggered speculation that he may have become the latest delivery worker to die from apparent overwork." On this news, Coupang's stock dropped by roughly 5%, or $2.30 per share, to close at $43.70 on March 25, 2021.

95.     On or around April 3, 2021, Coupang posted on its official website the following statements concerning its employee relations:

> ***Coupang pays great attention to the health and welfare of all employees***, and has a great responsibility to protect the safety and health of its employees. ***Coupang will continue to lead the courier logistics industry by prioritizing the health and safety of its employees***. Coupang will continue to make efforts to create a better working environment by considering the health and safety of workers as the company's core value and first management principle.

96.     On or around May 4, 2021, Coupang posted a statement to its online newsroom, declaring that the Item Winner system allowed sellers to "fairly" compete with one another:

> ***Coupang's Item Winner (one product, one page system) is an improved service*** that allows consumers to make purchasing decisions based on consumer experience, unlike existing open markets that focus on advertising cost competition.

28

*. . . **Through this, sellers can compete fairly without the burden of advertising costs**, and customers can easily find the best products.*

97.     The release further stated: "Many sellers have continued to grow sales by entering the item market where they **can compete fairly without advertising costs**."

98.     Coupang further declared:

**Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act**. . . . The representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller. Coupang clearly guides sellers to upload only product images when registering images, and the detail page screens that sellers individually upload are not shared with other sellers. **Therefore, the claim that Coupang infringes on the copyrights of sellers' images is not true at all**.

99.     On May 12, 2021, Coupang hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During this call, Defendant Kim stated: "[T]he most important competitive advantage that Coupang has is really our orientation. We've made—we've always worked backwards from the customer."

100.    During the same earnings call, Defendant Anand stated as follows in response to a question about the "mix" of owned inventory, or 1P, versus third-party, or 3P, sales:

[O]n your second question of 1P versus 3P mix change, we continue to see strong growth in both 1P and 3P and there is no material change and mix at this time. So, we are focused on both the services and continue to drive initiatives in each of them. **However, over time, we would become agnostic between our owned inventory and third-party selection**.

101.    On May 13, 2021, the Company filed its quarterly report for the first quarter 2021 on Form 10-Q with the SEC, stating: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

102.    On or around June 14 and July 2, 2021, Coupang posted on its official website the following statements concerning its relationships with merchants and suppliers:

***Coupang is focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region***. Coupang will continue to support small and medium-sized businesses in order to revitalize local coexistence and the stagnant local economy.

103.     On August 11, 2021, Coupang hosted an earnings call with investors and analysts to discuss the Company's results for the quarter ended June 30, 2021. During this call, Defendant Kim stated the following:

We exist to deliver new moments of WOW for customers. ***Everything we do at Coupang revolves around wowing our customers***. Our confidence that we'll continue to make investments, to keep chasing the demand, ***to make sure that our customer experience is not compromised, that we protect long-term customer trust***. Because -- and we'll continue to do that aggressively, because we know that our investments will pay off over time.

104.     On the same call, Defendant Kim further stated that "Our investments that continuously strengthen the virtuous cycle across our business ***are driving significant growth for merchants and vendors***."

105.     On August 16, 2021, Coupang filed its quarterly report for the second quarter 2021 on Form 10-Q (the "2Q 2021 10-Q") with the SEC. The 2Q 2021 10-Q stated: "We have policies and procedures to protect both merchants and customers on our marketplace."

106.     On or around August 19, 2021, Coupang posted on its official website the following statements concerning the KFTC sanctions:

I will tell you about the FTC sanctions. The essence of this case is that large conglomerate manufacturers discriminated against supply prices in order to check new distribution channels such as Coupang. In fact, LG Household & Health Care, the No. 1 household goods company in Korea, has used its exclusive supplier position to supply major products to Coupang for a long time at prices higher than those of other distributors. . . . Coupang has attempted to innovate so that consumers can purchase products faster and cheaper in the distribution market, which has been dominated by chaebols and conglomerates. ***At the same time, we have continued to innovate distribution by lowering entry barriers to SMEs [small and medium-sized businesses] and pursuing shared growth***.

107.     On or around September 16, 2021, Coupang posted on its official website the

following statements concerning its relationships with merchants and suppliers:

> *The "Item Market," which allows fair competition without the burden of advertising costs, was also cited as a reason for being friendly to small business owners*. In order to solve the unfair sales structure centered on advertising cost competition, *Coupang is operating an "Item Market" system that comprehensively evaluates price, delivery, and customer response so that products that consumers will prefer the most are exposed first*.

108.    On November 12, 2021, Coupang hosted an earnings call to discuss the Company's results for the quarter ended September 30, 2021, during which Defendant Kim stated:

> Our strategy to build compounding customer loyalty and long-term shareholder value is reflected in our core operating tenants . . . . One, *we exist to deliver new moments of WOW for customers and create a world where they asked, "How did we ever live without Coupang?"* . . . Three, *we . . . employ technology, process innovation, and economies of scale to create an amazing customer experience and drive operating leverage and significant cash flows over time*.

109.    During the same call, Defendant Anand stated:

> We were less aggressive on customer acquisition this quarter to *improve the experience for existing customers. Prioritizing what's best for customers* drives loyalty and engagement and we believe that is the best long-term approach.

110.    Also on November 12, 2021, the Company filed its quarterly report for the third quarter 2021 on Form 10-Q with the SEC, stating: "*We have policies and procedures to protect both merchants and customers on our marketplace*."

111.    On or around February 27, 2022, Coupang posted another statement to its online newsroom concerning its product reviews, which provided:

> *Coupang's product reviews are operated in a fair and transparent manner, and when an employee writes a review, it is clearly stated*. When partners, including CPLB, launch new products in Coupang, Coupang employees and members are given the opportunity to try the products first, and *reviews are provided to help customers shop*.

112.    On March 3, 2022, the Company filed its annual report for 2021 on Form 10-K (the "2021 10-K") with the SEC. The 2021 10-K was signed by Defendants Kim, Anand, Parker,

Mehta, Sun, Warsh, and You. The 2021 10-K stated:

> We also continue to refine our business intelligence systems to **provide more personalized search results and recommendations to help existing customers find and buy more of what they need on Coupang**.

113.     The 2021 10-K further stated:

> We are committed to delivering a "wow" experience to all of our customers every day. **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

114.     With respect to the Company's merchants, the 2021 10-K stated:

> **We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation. Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience. This technology helps merchants compete holistically on overall customer experience**.

115.     In the 2021 10-K, the Company again represented: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

116.     The statements above were materially false and/or misleading and failed to disclose that: (i) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (ii) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations; (iii) the Company misappropriated protected trade content from its merchants to maximize the commissions it earned on third-party sales; (iv) the Company had improperly manipulated search algorithms and product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants; (v) the above mentioned misconduct exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny; and (vi) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of improper,

unethical, and/or illegal practices, and, thus, unsustainable.

***The Truth Emerges***

117.    On or around April 27, 2021, just a few months after Coupang represented to investors that its positive treatment of employees gave it a competitive advantage, *United Press International* reported on systemic, unsafe working conditions for Coupang's delivery drivers and employees at Coupang's fulfillment centers, noting that nine Coupang workers had died over the past year due to an inhumane working environment. The report further stated that the Committee for Coupang Workers' Human Rights and Health, created to improve the Company's workplace conditions, was pushing to form a labor union to force a safer work environment in response to poor conditions at the Company. The report quoted the co-chairman of the committee as stating: "'The management method of running a business at the expense of people's lives should not be tolerated for any reason. Humans are not machines.'" The report further emphasized Coupang's efforts to "muzzle media coverage" by suing journalists who had written about the Company's worker deaths.

118.    On this news, Coupang share price dropped $1.96 per share, or 4.3 percent, over the next two trading days to close at $43.71 per share on April 28, 2021.

119.    On June 17, 2021, a deadly fire broke out in the basement of the Company's Deokpyeong Logistics Fulfillment Center. It took emergency response workers multiple days to extinguish the blaze. The fire sparked outrage among the public in South Korea. Protestors claimed that the fire resulted from Coupang's inhumane working conditions. According to a statement issued by a transportation union under the Korean Confederation of Trade Unions, "[a]ctivation of sprinklers was delayed because they were shut off due to frequent malfunction." Thousands of users posted online claiming to have deleted their Coupang accounts under a hashtag that translated

to "Leave Coupang." Many of the posts chastised the Company's poor working conditions and accused Coupang of overworking its employees in its warehouses. Opposition lawmaker Kim Yong-pan, a member of the Public Administration and Security Committee in the National Assembly, South Korea's legislature, called the fire "a sad event that shows negligence of safety is still prevalent in our society." Aside from consumer criticism, this fire would ultimately cost Coupang millions of dollars in lost inventory, equipment, and other charges.

120.    On July 5, 2021, several news outlets, including the *Financial Times* in an article titled "Coupang faces probe over alleged manipulation of search algorithms," reported that Coupang was being investigated over "allegations it manipulated search algorithms to [prioritize] its own products over those of suppliers," by the KFTC. Such manipulation not only exposed Coupang to regulatory consequences but threatened the merchant relationships on which Coupang relied by promoting Coupang's products at the expense of those sold by third-party sellers.

121.    On this news, Coupang's stock price dropped $0.51 per share, or 1.3 percent, to close at $39.95 per share on July 6, 2021.

122.    On August 11, 2021, in its second quarter 2021 earnings release, Coupang reported a $518.6 million loss for the quarter, a fivefold increase from its loss in the second quarter of 2020. This outsized loss was due primarily to almost $300 million in inventory and equipment losses due to the June 2021 fire. According to an August 12, 2021 *Financial Times* article discussing these developments, the fire was a major contributor to the losses. An article in *Korea JoongAng Daily* wrote that the fire "more than doubled [Coupang's] loss."

123.    On this news, Coupang's stock price dropped $3.07 per share, or 8.3 percent, to close at $34.13 per share on August 12, 2021.

124.    On August 18, 2021, according to an article in *The Korea Times*, Coupang was

sanctioned by the KFTC for forcing "hundreds of [third-party] sellers from early 2017 to September 2020 to comply with its unlawful sales and marketing policies to maintain its competitive edge over other online retailers amid the fierce battle for market dominance." This included pressuring sellers to raise prices in goods sold at rival marketplaces "to ensure that [Coupang] could offer those products at the cheapest prices," and coercing "suppliers to purchase ads." Less than a week after Coupang again represented that its positive relationships with third-party sellers allowed Coupang to better serve its customers, investors were now learning that Coupang was forcing third-party sellers to comply with harsh and illegal policies. This both exposed Coupang to large regulatory liability and threatened to harm the merchant relationships upon which Coupang relied.

125.   On September 10, 2021, a KFTC representative announced that Coupang was participating in, and would be regulated for, search algorithm manipulation that had improperly prioritized its own products over those of third-party sellers. This announcement signaled a significant expansion of the regulator's prior findings that Coupang had engaged in anti-competitive business practices with suppliers. While attending the "Fairness and Transparency in Search Algorithms and Competition Issues" conference, Vice Chairman of the KFTC Kim Jae-Shin specifically mentioned Coupang by name when attacking e-commerce businesses engaged in illicit business practices such as search algorithm manipulation and stated: "[W]e have been receiving complaints that major online shopping platforms placed their own private-brand (PB) products in a better place on their page, while pushing competitors' products down to the bottom."

126.   On November 12, 2021, Coupang released its financial report for the third quarter of 2021, disclosing much higher than anticipated costs from the June 2021 fire, especially costs associated with labor and operations. During Coupang's earnings call for the third quarter of 2021,

Defendant Kim disclosed that the Company was having trouble hiring employees and that this difficulty was attributable in part to the June 2021 fire. Further, Defendant Kim disclosed that the fire had "lead to [] inefficiency in [Coupang's] network." Similarly, in its related quarterly financial report, Coupang stated that the fire had reduced the Company's capacity. This further revealed to investors that Coupang's dangerous working conditions, and the fire that resulted, had seriously undermined Coupang's ability to deliver promised services to its customers, harming its business overall.

127.    On this news, Coupang's stock price dropped $2.61 per share, or 8.9 percent, to close at $26.58 per share on November 12, 2021.

128.    On March 14, 2022, PSPD announced that it reported Coupang to the KFTC for manipulating product reviews for its PB products to ensure they receive more exposure in its search results and published findings supporting its claim.

129.    On March 22, 2022, *Korea JoonAng Daily* reported that the KFTC had opened yet another investigation into Coupang. This time, the KFTC was reportedly examining claims that Coupang had manipulated product reviews for its private-label branded products, sold through its Coupang Private Label Business ("CPLB") subsidiary, to make them appear more positive. The article stated, in relevant part:

> On March 15, civic groups such as the People's Solidarity for Participatory Democracy and The Voice of Consumers accused Coupang of making their employees write positive reviews for CPLB products.
>
> CPLB is a subsidiary wholly owned by Coupang. It sells everyday items such as clothes, pet supplies and food on the e-commerce website.
>
> ***The civic groups claim Coupang ordered its employees to write positive reviews for some 42,000 CPLB products*** since July last year, when the subsidiary started business. They said the reviews didn't explicitly state they were written by Coupang or CPLB workers, even though a disclaimer is required for reviews by employees of affiliates and people who were given the products for free.

*The FTC said it will investigate whether the civic groups' claims are true and if Coupang violated the Monopoly Regulation and Fair Trade Act and the Act on Fair Labeling and Advertising.*

According to the civic groups, a suspected Coupang or CPLB employee bought huge amount of products – 600 latex gloves, 350 masks, 150 liters (40 gallons) of cat litter sand throughout a month – and gave five stars to CPLB products but left one star ratings on non-Coupang products.

*The civic groups also claimed that the positive reviews and higher star ratings made CPLB products show up at the top of a search, giving them more exposure and leading to more purchases.*

130.    These revelations further showed investors the immense regulatory and reputational risks to which Coupang had exposed itself and failed to disclose, here by manipulating reviews on its own platform. This undermined Coupang's relationship with its customers by manipulating reviews of its own products, thus presenting a rosier picture of those products than was justified by organic reviews. Further, this harmed Coupang's relationship with its merchants by promoting Coupang's own products over the third-party products sold by those merchants.

131.    On July 13, 2022, *The Korea Times* released an article entitled "Coupang, Naver Hit By Antitrust Allegations," which reported that Coupang was now also under investigation by the KFTC for falsely advertising the membership benefits of its Rocket WOW membership services, stating, in relevant part:

Korea's two IT giants, Coupang and Naver, are under investigation by the Fair Trade Commission (FTC) over allegations that they *falsely advertised membership benefits and deceived customers, according to industry watchers*, Wednesday.

A dozen investigators with the antitrust agency were dispatched to the headquarters of Coupang in Songpa District, southeastern Seoul, and Naver in Bundang District of Seongnam, Gyeonggi Province, from late Monday through Tuesday, to conduct on-site investigations.

*Coupang allegedly sold goods to non-member customers at a lower price than those who paid monthly fees of 4,990 won ($3.82) for Wow membership, a sales practice Wow members characterize as reverse discrimination.*

> The allegation was first raised in May and amplified since then due to a large number of Coupang users filing complaints with a government website run by the Anti-Corruption & Civil Rights Commission.

> Many claimed that the prices shown to members and non-members alike indicate Wow members would be able to buy goods at cheaper prices compared to non-members, but the price is the same when Wow members make a purchase.

132. These revelations indicated that Coupang's repeated representations about customer benefits of Rocket WOW were false and misleading. In fact, Coupang was risking its relationship with its most loyal customers, along with exposing itself to regulatory risk, by upcharging Rocket WOW members.

133. On this news, Coupang's stock price dropped $0.74 per share, or 5.0 percent, over the following two trading days to close at $14.25 per share on July 14, 2022.

### Harm to the Company

134. As a direct and proximate result of the Individual Defendants' misconduct, Coupang has lost and expended, and will lose and expend, millions of dollars.

135. Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company, and, among others, its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

137. Such losses include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

138.     As a direct and proximate result of the Individual Defendants' conduct, Coupang has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

140.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

141.     Coupang is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

142.     Plaintiff is a current shareholder of Coupang and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

143.     A pre-suit demand on the Board of Coupang is futile and, therefore, excused. At the time this suit was filed, the Board consisted of Defendants Kim, Mehta, Sun, and Warsh (the "Director Defendants") as well as non-parties Jason Child, Pedro Franceschi, and Ambereen Toubassy. Accordingly, Plaintiff is only required to show that four of the seven current members of the Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all four of the Director Defendants

are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

144.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

145.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

146.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

147.    Further, each of the four Director Defendants are named as defendants in the Securities Action and, therefore, face a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. The Director Defendants, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon the Director Defendants would be futile.

148.    Additionally, the Director Defendants received payments, benefits, stock options,

and other emoluments by virtue of their membership on the Board and their control of the Company.

149.    The Director Defendants were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Coupang's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

150.    Demand is futile on Defendant Kim for the following, additional reasons. Defendant Kim is the Company's CEO and the Chairman of the Board. As the Company admits, he is a non-independent director. Defendant Kim personally made false and misleading statements on earnings conference calls, signed the Registration Statements, and signed other public statements such as the 2021 10-K, which also contained false and misleading statements. Defendant Kim also beneficially held approximately 76% of the voting power over Coupang following the IPO due to his ownership of Class B common stock and thus had control over Coupang. As the Company's CEO and as Chairman, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Accordingly, Defendant Kim cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood, and demand upon him is futile and, thus, excused.

151.    Demand on Defendant Mehta is futile for the following, additional reasons. Defendant Mehta signed the Registration Statements and the 2021 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Mehta breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

152.    Defendants Sun is not disinterested or independent, and therefore, are incapable of considering demand because he served as a member of the Audit Committee and, pursuant to the Audit Committee Charter, was specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, oversight of the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. At all relevant times, however, Defendant Sun breached his fiduciary duty to the Company by failing to prevent, correct, or inform the Board of, the issuance of material misstatements and omissions regarding the Company's business and the adequacy of the Company's internal controls as alleged above. Therefore, the Defendant Sun cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

153.    Demand on Defendant Warsh is futile for the following, additional reasons. Defendant Warsh signed the Registration Statements and the 2021 Form 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme.

Therefore, Defendant Warsh breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

154.    Furthermore, demand, in this case, is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. The Director Defendants have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Director Defendants' conduct.  Thus, any demand on the Director Defendants would be futile.

155.    The Director Defendants have taken no remedial action to redress the conduct alleged herein, have not filed any lawsuits against the Individual Defendants, including themselves, or any others who were responsible for this wrongdoing, and have made no attempt to recover for Coupang any part of the damages it has suffered due to this wrongdoing. Therefore, any demand now upon the Director Defendants would be futile.

156.    The Individual Defendants' actions were not the product of legitimate business judgment as they were based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty. As all of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein are incapable of independently and disinterestedly considering whether to pursue this action on behalf of the Company. Therefore, demand is further excused as futile.

**COUNT I**

**Against The Individual Defendants For Violations of § 10(b)
of the Exchange Act and Rule 10b-5**

157.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as though fully set forth herein.

158.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. §
78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

159.    The Individual Defendants, individually and in concert, directly or indirectly,
disseminated or approved the false statements specified above, which they knew or deliberately
disregarded were misleading in that they contained misrepresentations and failed to disclose
material facts necessary in order to make the statements made, in light of the circumstances under
which they were made, not misleading.

160.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in
that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of
material facts or omitted to state material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not misleading; or (c) engaged in acts,
practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others
similarly situated in connection with their purchases of Coupang common stock.

161.    The Individual Defendants acted with scienter because they (a) knew that the public
documents and statements issued or disseminated in the name of Coupang were materially false
and misleading; (b) knew that such statements or documents would be issued or disseminated to
the investing public; and (c) knowingly and substantially participated or acquiesced in the issuance
or dissemination of such statements or documents as primary violations of the securities laws.

162.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Coupang, their control over, and/or receipt and/or modification of Coupang's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Coupang, participated in the fraudulent scheme alleged herein.

163.    As a result of the foregoing, the market price of Coupang's common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, the Company's shareholders considered and relied upon the Individual Defendants' statements described above and/or the integrity of the market price of Coupang common stock in purchasing Coupang common stock at prices that were artificially inflated because of these false and misleading statements.

164.    Likewise, as a result of the wrongful conduct alleged herein, the Company has also suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants
### For Contribution Under § 11(f) of the Securities Act

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Action brought on behalf of Coupang shareholders for claims brought under Sections

11, 12, and 15 of the Securities Act.

167.    Federal law provides Coupang with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

168.    The plaintiffs in the Securities Action allege that the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

169.    Coupang is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

170.    As issuer of the shares, Coupang is strictly liable to plaintiff and the class for the misstatements and omissions alleged in the Securities Action.

171.    The plaintiff in the Securities Action alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

172.    The Individual Defendants, because of their positions of control and authority as officers and directors of Coupang, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Coupang, including the wrongful acts complained of herein and in the Securities Action.

173.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates private right of action for contribution, which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

174.   As such, Coupang is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## COUNT III

**Against The Individual Defendants
For Breach Of Fiduciary Duty**

175.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

177.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

178.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

180.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

181.    Plaintiff on behalf of Coupang has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

184.    Plaintiff on behalf of Coupang has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants for Unjust Enrichment

185.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Coupang.

187.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Coupang that was tied to the performance or artificially inflated valuation of Coupang, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

188.     Plaintiff, as a shareholder and a representative of Coupang, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

189.     Plaintiff on behalf of Coupang has no adequate remedy at law.

## COUNT VI

**Against The Individual Defendants For Waste Of Corporate Assets**

190.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

192.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and

(b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

193.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

194.    Plaintiff on behalf Coupang has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Coupang to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Coupang and its stockholders from a repeat of the damaging events described herein;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: August 22, 2023

**RIGRODSKY LAW, P.A.**

By: */s/ Timothy J. MacFall*
_____

Seth D. Rigrodsky

Timothy J. MacFall

Of Counsel:

Gina M. Serra

Vincent A. Licata

Joshua H. Grabar

825 East Gate Boulevard, Suite 300

**GRABAR LAW OFFICES**

Garden City, NY 11530

One Liberty Place

Telephone: (516) 683-3516

1650 Market Street, Suite 3600

Email: sdr@rl-legal.com

Philadelphia, PA 19103

Email: tjm@rl-legal.com

Telephone: (267) 507-6085

Email: gms@rl-legal.com

Email: jgrabar@grabarlaw.com

Email: vl@rl-legal.com


*Attorneys for Plaintiff*